## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

**CONSUELO W. WILLIAMS,**

      **Plaintiff,**

**v.**                                **Case No.: 3:18-cv-01282**

**ANDREW M. SAUL,**
**Commissioner of the**
**Social Security Administration,**[1]

      **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in his favor. (ECF Nos. 16, 19).

---

[1] Pursuant to 42 U.S.C. § 405(g) and Rule 25(d) of the Federal Rules of Civil Procedure, the current Commissioner of the Social Security Administration, Andrew M. Saul, is substituted for former Acting Commissioner, Nancy A. Berryhill, as Defendant in this action.

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On November 18, 2016, Plaintiff Consuelo W. Williams ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of June 20, 2015 due to "type 2 diabetes, thyroid, and bad eyes." (Tr. at 383-98, 401-02, 422). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 16, 223, 228, 241). Claimant then filed a request for an administrative hearing, which was held on April 26, 2018 before the Honorable Neil Morholt, Administrative Law Judge. (Tr. at 41-94). By written decision dated May 17, 2018, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 13-40). The ALJ's decision became the final decision of the Commissioner on July 13, 2018 when the Appeals Council denied Claimant's request for review. (Tr. 1-7).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Claimant filed a Brief in Support of Motion for Judgment on the Pleadings and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 16, 19). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 42 years old on her alleged onset date and 44 years old on the date

of the ALJ's decision. (Tr. at 31). Claimant completed high school and previously worked as a teacher's aide in a special education classroom. (Tr. at 423).

III.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this

determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes

of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2017. (Tr. at 19, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since June 20, 2015, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: diabetes mellitus, thyroid gland dysfunction, diabetic retinopathy, asthma, chronic kidney disease, obesity, right carpal tunnel syndrome, borderline intellectual functioning, depression, and anxiety. (Tr. at 19-

5

20, Finding No. 3). The ALJ considered Claimant's purported hearing loss, but he concluded that it was not a medically determinable impairment, and the ALJ also considered Claimant's low back and left hip and knee pain, but he found the impairments to be non-severe. (Tr. at 19-20).

Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 20-22, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can: occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, or crawl; frequently handle and finger bilaterally; and frequently use hand and foot controls bilaterally. The claimant should avoid frequent exposure to extreme cold, extreme heat, humidity, dust, odors, fumes, and other pulmonary irritants, unprotected heights, and moving mechanical parts, and can have no exposure to driving a motor vehicle. The claimant makes use of a quad cane to ambulate. Mentally, the claimant can: understand, remember, and carry out simple, routine, repetitive, one-to-three step tasks; frequently interact with supervisors and coworkers; and occasionally interact with the general public.

(Tr. at 22-31, Finding No. 5). At the fourth step, the ALJ determined that Claimant could not perform her past relevant work. (Tr. at 31, Finding No. 6). Therefore, the ALJ reviewed Claimant's past work experience, age, and education in combination with Claimant's RFC to determine Claimant's ability to engage in other substantial gainful activity. (Tr. at 31-32, Finding Nos. 7 through 10). The ALJ considered that (1) Claimant was born in 1973 and was defined as a younger individual on the alleged disability onset date; (2) Claimant had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of

Claimant's transferable job skills. (Tr. at 31, Finding Nos. 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including light-level work as a nut and bolt assembler, package labeler, and price marker or sedentary-level work as a final assembler, sorter, or table worker. (Tr. at 31-32, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 32, Finding No. 11).

## IV.   <u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant raises three identifiable challenges to the Commissioner's decision. First, she challenges the ALJ's consideration of the opinion evidence. She contends that the ALJ substituted the opinions of her "treating physicians for those of non-treating, record-reviewing state physicians." (ECF No. 16 at 15). She identifies a June 20, 2017 RFC evaluation in which her primary care physician, Anna Patton, M.D., stated that Claimant was disabled since January 2015. (*Id*. at 16-17). Claimant notes that Dr. Patton also rendered a mental RFC evaluation on April 16, 2018. (*Id* at 17.). In addition, Claimant states that the ALJ failed to consider the opinions of Stanley Tao, M.D., Harold Rose, O.D., James Elliott, O.D.,[2] and Steven Novotny, M.D. (*Id*. at 19). In her additional challenges to the Commissioner's decision, Claimant asserts that the ALJ failed to develop medical evidence concerning Claimant's conditions and failed to consider and evaluate her claim under the combination of impairments theory. (*Id*. at 15-19).

---

[2] Claimant identifies the provider as "James Endicott, M.D.," who is incorrectly listed in the index of the Transcript of the Administrative Proceedings as the author of a treatment record signed by James Elliott, O.D. (Tr. at 1345-50). Therefore, the undersigned construes Claimant's challenge as referring to Dr. Elliott's opinion, as there are no records from Dr. Endicott in the file.

In response to Claimant's arguments, the Commissioner states that substantial evidence supports the ALJ's RFC assessment that Claimant could perform a range of light work. (ECF No. 19 at 14). The Commissioner points out that the record contains over 1,300 pages of evidence, including numerous treatment records and opinions, and Claimant did not request any further development of the record. (*Id*. at 14-15). The Commissioner further argues that the ALJ correctly analyzed the medical opinions and considered Claimant's impairments in combination. (*Id*. at 15-25).

## V.    **Relevant Evidence**

The undersigned has reviewed all of the evidence before the Court. The information that is most pertinent to Claimant's challenges is summarized as follows:

### A. Treatment Records

#### 1. Before alleged onset of disability

In May 2011, Claimant reportedly fell over a large box of books at work and landed on her left knee. (Tr. at 1299). She sought treatment at an urgent care facility where the attending provider recommended anti-inflammatory medication, ice, and elevation. (*Id*.). Claimant followed up with her primary care physician, who prescribed physical therapy and pain medication, and referred Claimant to orthopedist Stanley S. Tao, M.D. In February and March 2012, Dr. Tao examined Claimant and diagnosed her with a left knee sprain, noting that Claimant's MRI showed no internal derangement and her x-ray only showed mild osteoarthritis. (Tr. at 1295-1300). On examination, Claimant had some mild crepitus with motion and tenderness, but her gait was normal. (*Id*.). Dr. Tao gave Claimant an injection in her left knee, which caused some improvement in Claimant's symptoms, and Dr. Tao concluded that Claimant should finish physical therapy and then return to work without restrictions. (Tr. at 1295-98).

On June 17, 2015, Claimant saw Dr. Patton at Catlettsburg Family Care Center for a routine examination to monitor her diabetes. Claimant's condition was stable without hypoglycemic complications. (Tr. at 552). The following day, optometrist Dr. Rose performed Claimant's annual eye examination. (Tr. at 1314). There was no evidence of retinopathy or diabetic vision complications. (Tr. at 1315). Dr. Rose updated Claimant's eyeglasses prescription for her nearsightedness, astigmatism, and farsightedness. (*Id.*).

### 2. After alleged onset of disability

Approximately one month after Claimant saw Dr. Rose, Claimant presented to Dr. Elliott for another eye examination on July 17, 2015. Claimant reported worsening blurred vision. (Tr. at 1345). However, she still stated that although her diabetes was unstable, she had no other associated symptoms. (*Id.*). Claimant was prescribed glasses and contact lenses. (Tr. at 1350).

A few days later, on July 20, 2015, Claimant presented to Cabell Huntington Hospital complaining of chest pain. (Tr. at 532). Claimant's serial contrast-enhanced cardiac MRI and EKG revealed no issues, and her pain resolved with treatment for gastroesophageal reflux disease (GERD). (*Id.*). Claimant was discharged the following day and she followed up with Dr. Patton on July 24, 2015, reporting a sudden onset of epigastric pain. (Tr. at 562). Dr. Patton noted Claimant's recent hospitalization for chest pain, remarking that Claimant's "work up was negative" and that Claimant was told at discharge to follow up with a cardiologist, but she never made an appointment. (*Id.*). Dr. Patton diagnosed Claimant with GERD and referred her to a cardiologist and a gastroenterologist. (Tr. at 569-70).

On March 22, 2016, Claimant again saw Dr. Patton for a regular diabetic follow-up appointment. Claimant's symptoms were listed as stable despite the fact that Claimant

had a long history of uncontrolled diabetes and her glucose reportedly would not come down although she took her insulin and reportedly followed a diabetic diet. (Tr. at 571). Dr. Patton recorded that Claimant was only compliant with treatment some of the time, her blood glucose monitoring was poor, and she never exercised. (*Id.*). During that visit, Claimant complained of feeling depressed lately, being fatigued all of the time, and having occasional panic attacks. (*Id.*). Dr. Patton referred Claimant to an endocrinologist, counseled her regarding diet and exercise, and prescribed Zoloft and Atarax. (Tr. at 579).

On June 23, 2016, Claimant had another three-month follow-up appointment with Dr. Patton. Claimant's hypertension was controlled, and she showed moderate improvement from her current treatment plan, although she had problems complying with the exercise and diet plan. (Tr. at 581). Claimant's diabetes was likewise stable with insulin injections, and her blood glucose averaged 130-140 mg/dl.[3] (*Id.*). Claimant complained of moderate left knee pain that was fluctuating and left ear pain, but she stated that Zoloft was helping her depression. (Tr. at 581-82). Dr. Patton diagnosed Claimant with diabetic peripheral neuropathy, degenerative disc disease of the lumbosacral spine, left knee pain, GERD, generalized anxiety disorder, major depressive disorder, uncontrolled type 2 diabetes with retinopathy, acquired hypothyroidism, allergic rhinitis due to pollen, hypertension, left ear infection, and vitamin B deficiency. (Tr. at 589-90). Dr. Patton prescribed medications for the conditions.

When Claimant saw Dr. Patton the next year, on April 14, 2017, her diabetes symptoms were still stable, although she followed a generally unhealthy diet and did not exercise at all. (Tr. at 682). Claimant's blood glucose readings fluctuated, generally

---

[3] Target blood glucose levels for a person with diabetes is less than 130 mg/dl before meals and less than 180 mg/dl one to two hours after meals. https://www.medicalnewstoday.com/articles/317536.php

ranging between 140 and 180 mg/dl. (*Id*.). Her hypertension was controlled with moderate improvement from treatment. She had mild back pain for which medications provided moderate relief and moderate left knee pain that was mildly relieved by medication. (Tr. at 682-83). Dr. Patton refilled Claimant's medications and increased Claimant's prescription for Lantus to twice per day. (Tr. at 693). Dr. Patton also counseled Claimant regarding carbohydrate counting and exercise. (*Id*.).

On May 15, 2017, Claimant saw orthopedic nurse practitioner, Bobby Marcum, FNP-BC, regarding a right radial head fracture. (Tr. at 1283). Claimant stated that she became dizzy due to hypoglycemia and fell on her right elbow four days earlier. (Tr. at 1284). Claimant felt well other than some discomfort in her lateral elbow. (*Id*.). Nurse Marcum concluded that the fracture was subtle; thus, he provided a sling, recommended light range of motion exercises, and prescribed Ultram for pain. (Tr. at 1285).

Claimant saw Dr. Patton on July 17, 2017, stating that she was experiencing increased burning sensation in her feet. (Tr. at 790). She also reported chronic neck pain, left knee pain, dysuria, and insomnia. (*Id*.). Dr. Patton refilled Claimant's medications and prescribed Remeron for Claimant's insomnia. (Tr. at 801).

During Claimant's next three-month follow-up appointment with Dr. Patton on October 18, 2017, Claimant's diabetes disease course was fluctuating, but she did not have any hypoglycemic complications and her symptoms remained stable. (Tr. at 776). Claimant's hypertension was also still controlled on medications. (*Id*.). Claimant's blood pressure was 133/85 and the only issues noted on her physical examination included epigastric tenderness, decreased range of motion and tenderness in her right knee, and right cervical adenopathy. (Tr. at 785-86). Claimant was prescribed an antibiotic for a dental abscess, medication for insomnia, Zoloft for depression and anxiety, as well as

medications for GERD, chronic left knee pain, a yeast infection, mild intermittent asthma without complications, laryngopharyngeal reflux disease, diabetic peripheral neuropathy, seasonal allergies, diabetes, and hypothyroidism. (Tr. at 787).

On October 25, 2017, Claimant saw gastroenterologist Cheryl L. Bascom, M.D., who diagnosed Claimant with GERD without esophagitis; odynophagia; nausea; non-intractable cyclical vomiting with nausea; burping; and upper abdominal pain. (Tr. at 761). Claimant was scheduled for an EGD and Bravo test. (*Id.*). The following month, Claimant's urologist, Frederick Martinez, M.D., diagnosed Claimant with a non-obstructing left renal stone (Tr. at 722, 730). Dr. Martinez scheduled Claimant for a follow-up appointment in six months and advised her regarding dietary changes for stone prevention. (Tr. at 733). Shortly thereafter, on November 17, 2017, Claimant had her four-hour gastric emptying test, which showed no evidence of gastroparesis. (Tr. at 763).

Claimant followed up with Nurse Marcum on January 15, 2018 regarding her right elbow fracture. It had been eight months since her injury, and she was progressively improving and healing. (Tr. at 832). Claimant's range of motion, sensation, and strength were normal, but she had some pain in her right forearm extending into the lateral epicondyle region upon resisted extension. (*Id.*). Nurse Marcum referred Claimant to orthopedic specialists and suggested possible injection and physical therapy followed by use of a tennis elbow strap. (*Id.*). Claimant asked to be referred to a specialist for her low back pain as well. (Tr. at 833).

Three days later, on January 18, 2018, Claimant followed up with Dr. Patton. Her asthma was significantly improved with treatment and her diabetes was stable. (Tr. at 1011). However, Claimant reported moderate lumbosacral pain that radiated into her left extremity, and she stated that treatment only provided mild relief. (Tr. at 1011-12).

Claimant's blood pressure was 116/83 and her physical examinations were normal other than poor dentition, decreased range of motion and tenderness in her left knee, and decreased sensation in her feet. (Tr. at 1021). Her diagnoses included mild intermittent asthma without complication, acquired hyperthyroidism, type 2 diabetes with hyperglycemia, essential hypertension, chronic seasonal allergy to pollen, GERD without esophagitis, moderate single episode major depressive disorder, psychophysiological insomnia, left-sided sciatica, other mixed anxiety disorders, diabetic peripheral neuropathy, and a dental abscess. (Tr. at 1021-22). Claimant's medications were refilled; her prescription for Lantus was increased for better glucose control; and she was prescribed valium, as needed, for anxiety. (Tr. at 1023). Dr. Patton noted in Claimant's chart that Claimant had "multiple, worsening medical issues" and was "unable to maintain any type of meaningful employment." (*Id.*). Dr. Patton reportedly advised Claimant that pain medications could help her perform activities of daily living, but that they would not resolve all pain symptoms. (*Id.*).

Claimant saw Dr. Patton later that month on January 29, 2018, stating that her back pain was radiating into her right lower extremity. (Tr. at 1062). Claimant's blood pressure was 108/75 and her physical examination did not reveal any issues other than tenderness at her "left sciatic notch" for which Dr. Patton prescribed Percocet. (Tr. at 1072-73).

On February 1, 2018, Claimant saw orthopedist, Dr. Novotny, regarding numbness and tingling in her hands at nighttime, cramping and locking of the right index finger at nighttime, and right elbow pain. (Tr. at 1267). Dr. Novotny noted that Claimant initially reported improvement following her right radial head fracture, but that she now stated that her symptoms were worsening. (*Id.*). He recommended carpal tunnel braces to wear

at nighttime, a stretching program, finger splints at nighttime, and electrodiagnostic studies for further evaluation of Claimant's complaints. (*Id*.).

Claimant saw Dr. Bascom again on March 7, 2018 regarding her gastrointestinal issues. Her diagnoses included GERD with esophagitis, submucosal lesion of stomach, nausea, and helicobacter positive gastritis. (Tr. at 1133). Claimant was referred for an endoscopic ultrasound to evaluate her stomach lesion. (*Id*.).

On March 9, 2018, Claimant underwent nerve conduction studies, which showed evidence of mild median mononeuropathy in Claimant's right wrist. (Tr. at 1225). She followed up with Dr. Novotny on March 15, 2018 to discuss the results. Dr. Novotny documented that Claimant's reported symptoms were discordant to the mild diagnostic findings. (Tr. at 1258). Nonetheless, he diagnosed Claimant with right pronator and carpal tunnel syndromes and recommended carpal tunnel release and pronator decompression surgeries. (Tr. at 1259).

Later that month, on March 27, 2018, Dr. Patton prescribed Claimant a quad cane to use daily to assist with ambulation, and Claimant was also issued a disabled persons parking placard. (Tr. at 1137-38, 1233). On April 7, 2018, Claimant presented to the emergency department at St. Mary's Medical Center with nausea, vomiting, and a headache. (Tr. at 1318). She returned again two days later with the same symptoms. (Tr. at 1327). She was diagnosed with dehydration, nausea and vomiting, acute sinusitis, and acute otitis media. (*Id*.). Claimant was prescribed medications and discharged the same day. (Tr. at 1331-32).

### B. Evaluations and Opinions

#### 1. Before alleged onset of disability

On January 30, 2015, Dr. Patton completed a physician certification form in

connection with Claimant's application to discharge her student loan obligations based upon permanent or total disability. (Tr. at 704). Dr. Patton stated that Claimant was unable to work due to lumbar degenerative disc disease, depression, diabetes, and osteoarthritis. (*Id.*). Dr. Patton opined that Claimant could sit for no more than 30 minutes, stand/walk for no more than 10 minutes, and lift no more than 20 pounds. (*Id.*). Dr. Patton also noted that Claimant had "trouble dealing with crowds." (*Id.*).

### 2. After alleged onset of disability

On January 21, 2017, state agency physician, Thomas Lauderman, D.O., assessed Claimant's RFC based upon a review of Claimant's records. Dr. Lauderman concluded that Claimant could perform light-level work with occasional postural activities and no concentrated exposure to temperature extremes or even moderate exposure to hazards. (Tr. at 158-60).

On February 10, 2017, Lester Sargent, M.A., conducted a mental evaluation of Claimant. Claimant displayed no more than mild mental limitations in the examination, other than a moderate limitation in recent memory based on her ability to recall two of four words after a five-minute delay and a moderate limitation in social functioning during the evaluation. (Tr. at 607-08). Mr. Sargent diagnosed Claimant with single episode major depressive disorder that was moderate and generalized anxiety disorder. (Tr. at 608).

On February 22, 2017, Kip Beard, M.D., performed an internal medicine examination of Claimant. Her blood pressure was 120/70 and her corrected vision was 20/30. (Tr. at 614). Although her pace was mildly slow, she did not use an ambulatory aid and her gait and station were stable. (Tr. at 614-15). Dr. Beard's examination of Claimant's

pulmonary, cardiac, neck, abdomen, extremities, and cervical spine faculties did not reveal any issues, and Claimant had normal range of motion in her spine and joints and normal muscle strength. (Tr. at 616-17, 619, 620-21). Claimant had minimal tenderness and pain on range of motion testing in her thoracolumbar spine, decreased sensation in the tips of her toes and fingers, and weak grip strength, but Claimant could make a fist, extend her fingers, and oppose her thumbs. (Tr. at 618, 619, 621). Claimant's Achilles' reflex was decreased, but her reflexes were otherwise normal. (Tr. at 621-22). Dr. Beard diagnosed Claimant with asthma/chronic bronchitis, type 2 diabetes mellitus with polyneuropathy and reported retinopathy, thoracic and low back pain, bilateral sciatica, kidney calculus, nausea and vomiting, and intervertebral disc displacement, per history. (Tr. at 622). Based on the objective evidence and clinical examination, Dr. Beard opined that Claimant's ability to perform physical work activities was preserved. (Tr. at 623). He noted that Claimant reported several subjective symptoms that she attributed to diabetes and stated that nausea and vomiting could distract her from work-related activities. (*Id.*).

On February 27, 2017, state agency psychologist, Joseph A. Shaver, performed a Psychiatric Review Technique, concluding that Claimant had only mild functional limitations in the paragraph B criteria. (Tr. at 169). Rank Roman, Ed.D., affirmed this assessment on May 9, 2017. (Tr. at 195).

On March 4, 2017, Dr. Lauderman re-assessed Claimant's RFC based upon updated records, this time concluding that Claimant could perform work at the medium exertional level with frequent climbing of ladders/ropes/scaffolds, but no other postural limitations, and the same environmental limitations as he previously assessed. (Tr. at 171-72).

16

On April 14, 2017, Dr. Patton authored a letter stating that Claimant was an active patient at her practice, who suffered from multiple medical issues and was unable to hold any meaningful employment. (Tr. at 696). Dr. Patton noted that Claimant's medical issues were chronic and expected to last over five years. (*Id*.).

On May 4, 2017, Narendra Parikshak, M.D., assessed Claimant's RFC at the reconsideration level of review, finding that Claimant could perform light work with occasional climbing of ladders/ropes/scaffolds and crawling; frequent balancing, stooping, and crouching; and no concentrated exposure to temperature extremes, humidity, fumes, and hazards. (Tr. at 197-98). Dr. Parikshak stated that she gave limited weight to the consultative report because it was a one-time examination of Claimant, and she concluded that the opinion from Dr. Patton was not consistent with the medical evidence. (Tr. at 198).

On June 20, 2017, Dr. Patton completed an RFC evaluation form, stating that Claimant could perform work at the light exertional level, except that she could only stand/walk for two hours and sit for two hours in an eight-hour workday. (Tr. at 708). Dr. Patton also noted that Claimant's ability to push and pull with her lower extremities and reach in all directions was limited, and Claimant could only occasionally climb ramps/stairs or balance and could never climb ladders/ropes/scaffolds, stoop, kneel, crouch, or crawl. (*Id*.). Finally, Dr. Patton expressed that Claimant should avoid concentrated exposure to noise and moderate exposure to other environmental conditions. (*Id*.).

On April 16, 2018, Dr. Patton completed a mental RFC assessment form, noting that Claimant was moderately limited in remembering locations and work like procedures; maintaining attention and concentration for extended periods; performing

activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; working in coordination with or proximity to others without being distracted by them; making simple work-related decisions; interacting appropriately with the general public; getting along with coworkers or peers without distracting them or exhibiting behavior extremes; setting realistic goals and making plans independently of others. (Tr. at 1310-11). Dr. Patton further opined that Claimant was markedly limited in understanding, remembering, and carrying out detailed instructions; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; responding appropriately to changes in the work setting; and traveling to unfamiliar places or using public transportation. (*Id.*). Dr. Patton check-marked a box stating that Claimant would be absent from work four or more days per month due to her impairments or treatment. (Tr. at 1311).

### C. School Records

In 1988, Claimant's verbal IQ was measured to be 86, her performance IQ was 80, and her full scale IQ was 81 on the WISC-R test. (*Id.*). Claimant was reevaluated in 1991, while in grade 11, at which time she was in the Specific Learning Disability (SLD) program for three of her classes. (Tr. at 1354). On the Adaptive Behavior Inventory, Claimant was in the 84th percentile in self-care skills, 25th percentile in communication skills, 37th percentile in both social and academic skills, and 63rd percentile in occupational skills. (Tr. at 1358). At that time, Claimant's verbal IQ was measured to be 74, her performance IQ was 66, and her full scale IQ was 70. (Tr. at 1359). Her range of overall intellectual ability was determined to be borderline. (*Id.*).

18

### D. Claimant's Statements

At her administrative hearing on April 26, 2018, Claimant testified that she was five feet and three inches tall and weighed 202 pounds. (Tr. at 48). Claimant stated that she checked her blood glucose level six or seven times per day and she took insulin accordingly. (Tr. at 49-50). Claimant testified that she also suffered from nausea and vomiting at least five times per week; recurrent kidney stones/bad kidneys; asthma; neuropathy in her hands, feet, and entire left side of her body; dizziness; inability to be around other people; depression; deteriorating discs in her back; bad knees; carpal tunnel syndrome; diabetic retinopathy; a right elbow fracture that was not yet fully healed; difficulty concentrating; some trouble with reading/writing/comprehension; and irritable bowel syndrome. (Tr. at 50-51, 58-59, 61, 63). Claimant testified that she used a quad cane to ambulate. (Tr. at 51, 54-55). She reportedly stopped working as a teacher's aide in June 2015 after she was injured and, although she tried to return to work, she was unable to keep up with the physical requirements. (Tr. at 52-53, 61). Claimant testified that she received injections in her knees, but surgery was not recommended, and she received physical therapy for her back issues, but it did not help. (Tr. at 55). Claimant also confirmed that the only mental health treatment that she received was from her primary care physician, Dr. Patton, who prescribed medication. (Tr. at 57).

## VI.    <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII. <u>Discussion</u>

As noted above, Claimant argues that the ALJ failed to properly evaluate the opinion evidence, develop the record regarding her impairments, or consider whether her combination of impairments met a listing. Below, each argument is considered in turn.

### A. *Medical Source Opinions*

Claimant contends that the ALJ substituted the opinions of her treating physician, Dr. Patton, for those of state agency physicians that merely reviewed her records, but

never treated or examined her. (ECF No. 16 at 15). Claimant also asserts that the ALJ failed to consider the medical opinions of Drs. Tao, Rose, Elliott, and Novotny. (*Id.* at 19).

When evaluating a claimant's application for benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2).

The regulations outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.[4] *Id.*

---

[4] The special deference afforded to the opinion of a treating physician, often called the "treating physician rule," was eliminated for claims filed on or after March 27, 2017. 20 C.F.R. §§ 404.1520c, § 416.920c; *Rescission of Soc. Sec. Rulings 96-2p, 96-5p, & 06-3p*, 2017 WL 3928298 (S.S.A. Mar. 27, 2017). Claimant's applications were filed in November 2016. Thus, the undersigned applied the law in effect at that time. (Tr. at 16).

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6), and must explain the reasons for the weight given to the opinions.[5] "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4. Nevertheless, in appropriate circumstances, a treating physician's opinion may be rejected in whole or in part in favor of a conflicting opinion by a non-treating source; for example, when the non-treating source's opinion is well-supported by evidence and explanation, is more consistent with the record as a whole, and is offered by a source with specialization in the subject matter of the opinion. *See Brown v. Commissioner of Soc. Sec.,* 873 F.3d 251, 268 (4th Cir. 2017). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative

---

[5] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

Claimant first argues that the ALJ failed to consider the RFC opinions from her primary care physician. Dr. Patton. (ECF No. 16 at 17). However, as reflected in the written decision, the ALJ explicitly considered Dr. Patton's January 2015 opinion that Claimant could not hold any meaningful employment and could only sit for 30 minutes, stand/walk for 10 minutes, and lift no more than 20 pounds. (Tr. at 28); *see* (Tr. at 704).

The ALJ also considered Dr. Patton's June 2017 opinion that Claimant could, *inter alia*, lift 20 pounds occasionally, stand/walk for two hours, sit for two hours, and never climb ladders/ropes/scaffolds, stoop, kneel, crouch, or crawl. (Tr. at 28); *see* (Tr. at 708). Finally, the ALJ considered Dr. Patton's April 2018 opinion that Claimant's ability to perform most mental activities was moderately and markedly limited, and that Claimant would be absent from work four or more days per month due to her impairments or treatment. (Tr. at 28); *see* (Tr. at 1310-11).

The ALJ gave little weight to Dr. Patton's statement that Claimant was disabled because it concerned an issue reserved to the Commissioner, was based on Claimant's subjective complaints, and was inconsistent with the overall medical record. (Tr. at 28). As to Dr. Patton's other opinions, the ALJ specifically articulated his consideration of each of the factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). The ALJ noted regarding the first three factors that, although Claimant saw Dr. Patton frequently for several years for routine examinations, prescription refills, and diagnostic testing referrals, Dr. Patton did not cite any medical signs or laboratory findings to support the limitations that she assessed. (Tr. at 29). Furthermore, regarding the fourth factor, the ALJ found Dr. Patton's opinions to be inconsistent with the objective evidence, referencing that recent x-rays revealed relatively mild findings; Claimant's diabetes was controlled when she was compliant with treatment; and there was no evidence to suggest that Claimant's obesity justified the exertional limitations stated by Dr. Patton. (*Id.*). In addition, the ALJ discussed that Claimant did not have any other impairments, such as musculoskeletal or cardiovascular conditions, that would justify Dr. Patton's restrictions; rather, Dr. Patton's treatment notes consistently reported good range of motion, clear lungs with normal respiratory rate and effort, and a stable diabetic condition. (*Id.*). As to

24

the fifth factor, the ALJ emphasized that Dr. Patton was not a specialist in neurology, orthopedics, internal medicine, or psychiatry/psychology, and her opinion was thus entitled to less weight than if she were a specialist in such fields. (*Id.*). Finally, regarding the sixth factor, the ALJ found nothing in the record corroborating that Dr. Patton was familiar with the social security disability programs and their evidentiary requirements or the entire medical evidence of record when she issued her opinion. (Tr. at 30).

Based on the above, the ALJ properly weighed Dr. Patton's opinions by considering the appropriate factors listed in the regulations, and the ALJ supplied well-reasoned rationale for not giving Dr. Patton's opinions controlling weight. The ALJ's rationale is supported by substantial evidence from the record. In particular, contrary to the extreme limitations expressed by Dr. Patton, Dr. Patton's clinical notes repeatedly stated that Claimant's diabetes was stable without hypoglycemic complications and her hypertension was controlled with medication. Dr. Patton did not document any other physical examination or diagnostic findings to substantiate her opinion that Claimant was disabled, or to support the extreme opinions that she provided. (Tr. at 522, 571, 581, 682, 776, 1011). Veritably on the same date in January 2018 that Dr. Patton stated that Claimant was unable to maintain any type of meaningful employment due to multiple worsening medical issues, Dr. Patton recorded that Claimant's asthma was significantly improved with treatment, her diabetes was stable, she had only moderate lumbosacral pain that radiated into her left extremity and left knee pain, her blood pressure was 116/83, and Claimant's physical examination was normal other than poor dentition, decreased range of motion and tenderness in her left knee, and decreased sensation in her feet. (Tr. at 1011-12, 1021). The ALJ correctly assessed that Dr. Patton's medical source opinions were not supported by and did not reconcile with even Dr. Patton's own

treatment notes, much less the rest of the record. Thus, the ALJ appropriately assigned little weight to Dr. Patton's opinions due to their lack of supportability and inconsistency with the clinical and objective evidence.

As to Claimant's argument that the ALJ failed to consider the opinions of Drs. Tao, Rose, Elliott, and Novotny, Claimant does not articulate any opinion from these providers that the ALJ overlooked, and she certainly does not point to any evidence from such physicians that impacted the ALJ's ultimate disability decision. Dr. Tao merely treated Claimant for a left knee sprain several years before her alleged onset of disability. (Tr. at 1295-1300). He noted minimal physical examination findings and stated in March 2012 that Claimant could finish physical therapy and return to work without restrictions. (Tr. at 1296). Dr. Rose saw Claimant in June 2015 for an annual eye examination and he found no evidence of retinopathy or diabetic vision complications. (Tr. at 1315). Dr. Elliott similarly noted in July 2015 that although Claimant reported worsening blurred vision and unstable diabetes, she had no other associated diabetic symptoms. (Tr. at 1345). Dr. Elliott merely prescribed glasses and contact lenses. (Tr. at 1350). Finally, Claimant saw Dr. Novotny in February and March 2018 regarding numbness and tingling in her hands at nighttime, cramping and locking of the right index finger at nighttime, and right elbow pain. (Tr. at 1258, 1267). Dr. Novotny found Claimant's reported symptoms to be incongruous with mild nerve conduction study results. (Tr. at 1258). Nevertheless, he diagnosed Claimant with right pronator and carpal tunnel syndromes, and he recommended carpal tunnel release and pronator decompression surgeries. (Tr. at 1259).

Contrary to Claimant's assertion, the ALJ considered the evidence from the relevant period, particularly noting Claimant's clinical records from Drs. Elliott and Novotny. (Tr. at 24, 26). Claimant does not identify any error in the ALJ's consideration

of the medical opinions, and her generalization that the ALJ failed to consider the opinions, without any reference to any specific error by the ALJ, fails to carry any weight.

Therefore, for the reasons stated above, the undersigned **FINDS** that the ALJ properly examined each of the foregoing medical source statements, weighed them, and provided clear explanations for the weight given to them. The ALJ supplied references to the evidence to clarify and support his conclusions, and his analysis is supported by substantial evidence.

### B.    *Duty to Develop the Record*

Claimant next asserts that the ALJ failed to fully develop medical evidence regarding her low back allegations, type 2 brittle diabetes, thyroid disorder, diabetic retinopathy, kidney stones, depression, anxiety, neuropathy in hands and feet, bilateral carpal tunnel syndrome, asthma, bronchitis, difficulty sleeping, severe headaches, osteoarthritis, back and neck pain, deteriorating disc in back, deteriorating knees, and hearing loss. (ECF No. 16 at 15).

Claimant articulates a legal standard related to this challenge, but she fails to provide a factual basis showing the applicability of that standard to the present case. Claimant does not identify any inadequacies or gaps in the record that the ALJ should have developed. The ALJ's duty was to ensure that the record contained sufficient evidence upon which she could make an informed decision. *Ingram v. Commissioner of Social Security Administration,* 496 F.3d 1253, 1269 (11th Cir. 2007); *see also Weise v. Astrue,* No. 1:08-cv-00271, 2009 WL 3248086 (S.D.W. Va. Sept. 30, 2009). Consequently, when examining the record to determine if it was adequate to support a reasoned administrative decision, the court looks for evidentiary gaps that resulted in "unfairness or clear prejudice" to Claimant. *Marsh v. Harris,* 632 F.2d 296, 300 (4th Cir.

1980).

In this case, the Transcript of the Administrative Proceedings contained the records of Claimant's clinical treatment; independent physical and mental medicine examinations; opinions from treating, examining, and non-examining medical sources; as well as Claimant's adult function reports, pain questionnaires, and testimony during Claimant's administrative hearing. It is unclear what further information Claimant contends the ALJ should have developed. The undersigned **FINDS** that the record was sufficient for the ALJ to make an informed decision and that there were not inadequacies or evidentiary gaps in the record for which the ALJ was obligated to develop the evidence.

### C.    *Combination of Impairments*

Lastly, Claimant argues that the ALJ failed to consider whether the combined effect of her impairments met a recognized listing. (ECF No. 16 at 18-19). A claimant should be found disabled at the third step of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in the Listing. The Listing describes for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity. *See* 20 C.F.R. §§ 404.1525, 416.925. The Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would likely be found disabled regardless of their vocational background; consequently, the criteria defining the listed impairments is set at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). Because disability is presumed with a listed impairment, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet all of the specified medical criteria." *Id.* at 530. If the claimant is unable to demonstrate that his impairments, alone or in combination, match the criteria of a

particular listed impairment, the claimant may still establish disability by showing that his impairments are medically equivalent to the listed impairment.

To establish medical equivalency, a claimant must present evidence that his impairment, unlisted impairment, or combination of impairments, is equal in severity and duration to all of the criteria of a specific listed impairment. *Id.* at 530; *see also* 20 C.F.R. §§ 404.1526, 416.926. In Title 20 C.F.R. §§ 404.1526, 416.926, the SSA sets out three ways in which medical equivalency can be determined. First, if the claimant has an impairment that is described in the Listing, but (1) does not exhibit all of the findings specified in the listing, or (2) exhibits all of the findings, but does not meet the severity level outlined for each and every finding, equivalency can be established if the claimant has other findings related to the impairment that are at least of equal medical significance to the required criteria. *Id.* §§ 404.1526(b)(1), 416.926(b)(1). Second, if the claimant's impairment is not described in the Listing, equivalency can be established by showing that the findings related to the claimant's impairment are at least of equal medical significance to those of a closely analogous listed impairment. *Id.* §§ 404.1526(b)(2), 416.926(b)(2). Finally, if the claimant has a combination of impairments, no one of which meets a listing, equivalency can be proven by comparing the claimant's findings to the most closely analogous listings; if the findings are of at least equal medical significance to the criteria contained in any one of the listings, then the combination of impairments will be considered equivalent to the most similar listing. *Id.* §§ 404.1526(b)(3), 416.926(b)(3). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment ... A claimant cannot qualify for benefits under the 'equivalence' step by

showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan,* 493 U.S. at 531. The claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

In this case, the ALJ concluded, with appropriate analysis and citations to the record, that Claimant's impairments, alone or in combination, did not meet or equal the criteria in the listings related to endocrine disorders, special senses, asthma, or kidney functioning. (Tr. at 20-21). In addition, the ALJ considered Claimant's obesity in accordance with SSR 02-1p and performed the special technique applicable to mental disorders. (*Id.*).

Claimant broadly argues that "[e]ven a cursory review of the evidence of record would conclude that the totality of the claimant's medical and mental problems, when combined, totally disable her and meet or exceed the combination of impairments listing provided by the Social Security Regulations for disability." (ECF No. 16 at 18-19). However, Claimant fails to point to any specific evidence, or to any listing that her combination of impairments purportedly meets. Given the fact that Claimant offers no further explanation, and upon review of the decision, the undersigned **FINDS** that the ALJ's step three decision is supported by substantial evidence.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 16); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 19); **AFFIRM** the decision of the Commissioner;

**DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: July 17, 2019

Cheryl A. Eifert
United States Magistrate Judge

3